Hum,, J.
Appeal from the Court of Common Pleas of Lucas county.
This action was heard in this court on appeal from the judgment of the court of common pleas. The plaintiff Edwin S. Chittenden commenced his action to foreclose certain mortgages of which he claimed to be the owner, and which had been executed by Herbert J. Chittenden and Mary S. Chittenden, his wife. Three of these mortgages bore date July i, 1896, and they purported to secure two notes of $1,000 each, and one note of $2,455, all running for the period of five years. The other mortgage bore date April 18, 1900, and purported to secure a note of $6,500.
The petition is in the ordinary form for the foreclosure of mortgages and for personal judgment upon the notes against Herbert J. Chittenden, one of the defendants. Herbert J. Chittenden and Mary S. Chittenden are husband and wife, and Edwin S. Chittenden, the plaintiff, is the father of Herbert J. Chittenden.
Mary S. Chittenden filed her separate answer to this petition, and she admits therein the execution by Herbert J. Chittenden of the notes set forth in the petition, and denies all other allegations. And she alleges by way of defense that the three notes which bear date July 1, 1896, were given by Herbert J. Chittenden to Isaac S. Baldwin, without consideration, and that he thereafter assigned them to Edwin S. Chittenden. (I will say that all these notes and mortgages were given originally to Isaac S. Baldwin, and assigned to the plaintiff Edwin S. Chittenden). And she avers that Herbert J. Chittenden received nothing from the said Isaac S. Baldwin or any other person for the execution of said notes or any of them “and all the mortgages securing the same were executed by said Herbert J. Chittenden for the purpose of apparently incumbering his property for motives and reasons unknown to this defendant.” In her third defense she answers the petition as to the last note and mortgage — the one bearing date April 18, 1900, for $6,500, and she avers that that also was executed by Herbert J. Chittenden without any consideration, and that nothing passed from Baldwin to him therefor, or from any other person. She alleges further as to this note and mortgage:
*500 “That at the time of the execution of said note, the said Herbert J. Chittenden was planning and contemplating the abandonment of his lawful wife, this defendant, Mary S. Chittenden, and said note and mortgage 'were executed by him to prevent this defendant from collecting any alimony and defrauding her in the premises. That said Herbert J. Chittenden procured the signature of this defendant to said mortgage by representing to her that the same was a mortgage to secure $3,000 to another person, and without the knowledge of this defendant procured her signature to the said mortgage to the said Isaac S. Baldwin, without her knowing that it was a mortgage to him.”
She avers in her fourth defense that she did not acknowledge or sign or execute the $6,500 mortgage before any notary public or other officer, and that it was not witnessed in the presence of two witnesses. She alleges that this mortgage is not a lien upon the premises therein described.
A reply is filed denying these allegations that are set out in the answer by way of defenses.
Herbert J. Chittenden and Mary S. Chittenden were married on the 30th of July, 1896. The three notes, one for $1,000, another for $1,000, and one for $2,455, eacb secured by mortgage, were executed on the xst day of July, 1896, about 30 days before the marriage of Herbert and. Mary S. Chittenden. At the time of the execution of the last note and mortgage, for $6,500, they had been married about four years. The issue here is entirely between Mary S. Chittenden, and Herbert Chittenden and Edwin S. Chittenden, the plaintiff, the defendant Herbert Chittenden admitting, the allegations of the petition. He is in default for answer. The defendant Mary S. Chittenden claims that all these notes and mortgages were made by Herbert J. Chittenden to his father without any consideration whatever; and as she says in hex petition, the first three were made for purposes unknown to her. She claims as to the $6,500 note, made in July, 1900, it was made for the purpose of defrauding- her in her claim for alimony and for support against her husband, and that therefore, so far as she is concerned, this mortgage is void; and she claims that the property of Herbert J. Chittenden should be divested of this $6,500 mortgage, and relieved of it, so far as any claim that she may have for alimony, is con *501 cerned, if the court should find that she was entitled to alimony or had such a claim.
The defendant Herbert J. Chittenden and his father, the plaintiff, deny all fraud in the transaction, and claim that the notes and mortgages were made upon the dates alleged in the pleadings. The first three notes — the two for $1,000 each and the one for $2,455 — were made about 30 days before the marriage of Herbert J. and Mary S. Chittenden; they had been engaged to be married for perhaps three or four years prior to-their marriage. They lived happily together, until April, 1900. There was no trouble of any kind between them. Herbert J. made no complaint to her or to any one as to the conduct of his-wife, and she had no reason to suppose that he was unhappy in his marriage relation with her, or dissatisfied, or that he contemplated a separation from her. A day or two before April 18, 1900 — the date of the $6,500 note and mortgage — Herbert told his wife that it was necessary for him to borrow about $3,000, to raise money to satisfy a claim of an estate for which he had been acting as administrator, and that he could borrow this money of his father, and that it would be necessary for' him to give a mortgage to secure this and other indebtedness to his father. She demurred some to signing a mortgage. However, she went to his office soon thereafter, and a paper was drawn, as she testifies, ready for her to sign, which was in fact a deed of all of his real estate to his father. She objected to signing this, and asked him what there would be for her if he. transferred his property to his father, in case he died, and he assured her-that there was life insurance for her support. But she insisted that a mortgage should be given instead of a deed, if it was necessary to raise this money. ' So the deed was destroyed and a mortgage drawn, as she supposed, to Edwin S. Chittenden, the father of Herbert. She signed the paper, and it was acknowledged before a notary, and witnessed. The mortgage turned out afterwards to have been given to Isaac S. Baldwin, the brother-in-law of E. S. Chittenden, and in June following it was assigned by him to Edwin S. Chittenden. According to the testimony of Baldwin, Edward S. Chittenden and Herbert Chittenden had- talked with Baldwin before this, and procured His permission to make notes and mortgages hr *502 his name, and have them transferred to Edwin S. Chittenden. Herbert J. Chittenden claims to have been indebted to his father at this time in this amóunt. His father was apparently a suret}^ for him on a note, but had not been required to pay it at that time. Edwin S. Chittenden, the father, came to Toledo some years ago from Seneca county — Republic, Seneca county • — where he Ead been engaged in business. Selling out there, he came here, and claimed to have had some money which he turned over to Herbert from time to time, and he invested it in real estate, and it is claimed that father and son were to divide the profits. I will come back to their business relations further along. But out of these transactions between them it is claimed that this indebtedness grew, aside from this $3,000 note on which it was claimed the father was surety.
As I have said, Mrs. Chittenden finally, on the 18th day of April, 1900, signed this note for $6,500, which ran for three 3rears, and the mortgage securing it. The mortgage covered their homestead in this city as well'as all real estate which Herbert J. Chittenden at that time owned. At the time he asked her to sign the mortgage, their relations were as happy and pleasant, so far as Mrs. Chittenden knew, as they had been during their married life. There was no suggestion or hint to her that there had been any change in his feeling toward her, or that he intended or contemplated any separation from her. Upon his appealing to her to sign this mortgage with him, representing to her that he owed this amount to the estate, she finally consented and signed it. On the following Sunday, four days later, Herbert Chittenden told his wife he had concluded to leave her; that he had made up his mind that he was not happy in the married relation; that he preferred club life, and “preferred not to be tied to one woman,” and that he had concluded to leave her and not live with her any longer. The testimony is that this was the first intimation that she had ever had of any feeling of that kind toward her, or any purpose of this kind on his part. She testifies as to the shock and surprise that it was to her, and to her appeals to him to desist from his purpose and to continue to live with her as her husband; that she continued these appeals on the following Monday and Tuesday, but that he refused, and insisted that his purpose was fixed; *503 and on the following Tuesday he did leave her, and has never returned to her or lived with her since. She remained in the homestead for a short time, and then went to her parents, who live in Sandusky county, and has since lived with them. On Saturday, the day before he told his wife of this purpose, he told his father, Edwin S. Chittenden, of what he intended to do. The mortgage at that time had not been delivered to Edwin S. Chittenden, but still stood in the name of Isaac S. Baldwin, and was not assigned to Chittenden until June following. The mortgage was left for record at the recorder’s office on the 27th of April, 1900, five days after he left his wife, by Herbert J. Chittenden, and the recorder’s fees were paid by him.
Was this transaction, under the evidence in the case, a fraud upon Mary S. Chittenden, the wife of Herbert? ' And can she in a court of equity have this mortgage set aside, so far as her rights are concerned, and her claim as a wife, if she has any, made superior to this mortgage? The obligation of a husband to his wife is not only at common law an obligation to support and maintain her, but it is fixed in this state by express statute. Section 3110, Revised Statutes, provides: “the husband must support himself, his wife, and his minor children out of his property or by his labor.” If he is unable to do so, his wife must assist him so far as she is able. The wife, then, has this right under the law as against her husband, for her support and maintenance. She has this right against his property, unless the rights of others have interfered so as to exclude her. She is, it may be said, to that extent a creditor of her husband. It is an obligation that she may enforce against him. He is her debtor by virtue of this obligation that rests upon him. The statutes of the state give her a right upon certain grounds and under certain circumstances to enforce this obligation against him, by way of an action for alimony. Section 5702, Revised Statutes, provides the grounds for which alimony may be allowed, and among them, No. 3 is, an “Abandonment of the wife without good cause.” The evidence in the case and statements of counsel on both sides in open court show that there were commenced after this separation an action for alimony in Ottawa county, and an action for divorce and alimony in Sandusky county, bi ought by Mrs. Chittenden against her husband, and those actions are now pending, and the one for di *504 vórce and alimony will be tried it is said in a very short time. For the purposes of this case we hold that, by reason of these- - facts — this conduct of Herbert J. Chittenden — his wife is entitled to alimony. How much she is entitled to is not for us-to determine, but according to the undisputed facts in the case, she was on the 22d day of April, 1900, abandoned by her husband, and told by him that this abandonment would be permanent, and that he would never live with her thereafter.
It is contended that she cannot attack these mortgages if they were given for a good consideration to Edwin S. Chittenden ; that she voluntarily signed the mortgage, and that she-cannot now attack it, and that at the time they were signed' she had no claim for alimony — it had not at that time ripened. It is true that she signed this mortgage at the request of her husband, but she signed it for him as her husband. She joined with him in its execution upon his representation to her that this money or a part of it was needed for the purpose mentioned. She signed the mortgage for the purpose of enabling-him to raise the money for that purpose; she signed it to aid her husband; she signed it for one with whom she expected to-live as his' wife for- years to come, both of them being under thirty years of age. She signed it with no idea, with no-thought, that almost immediately after its execution she would be abandoned by her husband, and told by him that he would never live with her afterwards. It seems to us that this transaction was and is a fraud upon Mrs. Chittenden; that the concealment from her of his purpose, of his intention, at the time this mortgage was executed, was a fraud upon her; for we find from the evidence that at the time she signed this mortgage at his request, he had then determined to leave his wife as soon-as he conveniently could. And we find further from the evidence, that whether the claims of his father were valid as between him and Herbert or not, that he made this mortgage to his father at that time, or to Baldwin, to be assigned to his father for the purpose of incumbering this property so as to-prevent his wife collecting a judgment against him for alimony or for support. His father was not asking him for any s' ecific security. He was not asking for this note or for this mortgage, but on the -contrary they were made without his-father’s knowledge, much less his request. And we hold! *505 that Edwin S. Chittenden was bound by this fraud, whether ht had actual knowledge of his son’s intention or not. We holdi that the son was acting in this transaction for his father as his agent. The evidence discloses that during all of their business' transactions out of which it is claimed this indebtedness grew*, Herbert did all the business. He kept all books, made all entries; the money that was turned over to him, if any, by hiS father, was deposited in the bank in Herbert’s name. Wheneve# he, for any reason, wished to give his father a mortgage or note, he gave it without his father asking for any particular or specific note and mortgage. And this was all done and carried on by Herbert without his father’s knowledge. The old gentleman was not. in any sense an innocent purchaser. He parted with no new consideration for this $6,500 mortgage^ he gave up no security that he had. The only change that was made was that Herbert entered upon the books which he kept a credit to himself and a charge to his father when this note and mortgage were executed. If Edwin S. Chittenden took this note and mortgage charged with knowledge of this transaction, he had no better title than Herbert Chittenden would have taken. And as I say, we find that this was a fraud upon the rights of the wife, and that her right to support and alimony is of such a character that she may assert her claim as a creditor in this action. We cite Tate v. Tate, 19 Ohio C. C., 532, decided in this circuit. The syllabus is:
“Where a husband conveys his property for a grossly inadequate consideration to a third party, for the purpose of defeating his wife’s claim for alimony, and the purchaser, before and at the time of the sale, knew of this purpose and encouraged it, he by so taking said conveyance becomes a party tb the fraud against the wife, and in so far as the full consideration has not been paid, the property is held in trust subject to and chargeable with the decree for alimony; and the sum awarded as alimony will be made a lien upon such property.”'
“Alimony allowed the wife is chargeable upon lands in the hands of those who purchased from her husband for an inadequate consideration and with knowledge that the transfer was made in fraud of her rights, to the extent of the difference *506 between the value of the property and the consideration actually paid.
“A conveyance by the wife to her husband of her legal interest in certain real estate, for merely a nominal consideration, does not preclude her dower right in the property.”
In this case the wife had deeded property to her husband for a mere nominal consideration — one dollar, and they having decided to separate, afterwards he conveyed it to another person for very much less its value. The court say on page 323:
, “It is conceded that John B. Stuart acted for his wife, the .defendant Kate M. Stuart, and the testimony shows that she herself, as well as her husband, knew all about the trouble between Tate and his wife and their quarrels about the sale of this property, and Mrs. Tate’s refusal to join with her husband in conveying it. At the time Tate made this conveyance to Mrs. Stuart, he and his wife had determined to separate, and all the testimony points to the conclusion upon his part to get rid of the property for whatever it would bring him in cash, and so to place the proceeds that none of it might reach his wife; and whether he was drunk or sober at the time he made the conveyance, he carried this intention out to the letter. He did sell it and he did get the money, and he has kept all of it out of the hands of his wife.
“And of this determination to separate and of Tate’s intention to place his interest in that property beyond the reach of his wife, both Stuart and Mrs. Stuart had knowledge. Even if Mrs. Stuart was in ignorance of any of these facts, her husband who was acting for her, and whose acts she authorized and ratified, did know them and all of them; and his knowledge was her knowledge.”
So we say in this case, so far as Edwin S. Chittenden, is concerned, though he was ignorant of these facts, if he were, they were known to Herbert J. Chittenden, who was carrying on this transaction, and who in all these matters from beginning to end acted as the agent of his father.
It was held by the supreme court of this state in Ward v. Ward, 63 Ohio St., 125, [57 N. E. Rep., 1095], that where an engagement of marriage exists between a man and a woman, •and he, for the purpose of providing for children by a former marriage, without her knowledge, deeds to them real estate, *507 said deeds being put on record after his death, that that is a fraud upon her right of dower in the property of the man that she is about to marry, and that she can assert those rights after his death. The supreme court held that it was a fraud upon her to make those conveyances without her knowledge, in view of the relation that then existed between them — an engagement of marriage. I will read the syllabus:
“A conveyance by a man who has entered into a contract of marriage, which subsequently takes place, of a portion of his land to his sons by a former marriage, without consideration other than love and affection, and without the knowledge or consent of his contemplated wife, is a fraud on her marital rights, and she, at his death, is entitled to dower therein.”
In the case at bar when the $6,500 mortgage was executed these parties were married: it had gone beyond an engagement of marriage. She, it is true, unlike the woman in Ward v. Ward, supra, knew that this mortgage was being executed, and she herself signed it,' but, as we hold, she was induced by fraud to sign and execute this mortgage. She signed it, and was intending to sign for him as his wife, to raise this money for his use, he at the time having formed the purpose to abandon her, which he carried into execution within four days thereafter.
In arriving at this conclusion we have also considered the mortgages that were made before the marriage. It is claimed that they should also be set aside, so far as Mrs. Chittenden’s rights are concerned, but we are of opinion that they, having-been made four years before this separation, and made before marriage, that the court would not be justified in holding that so far as those mortgages were concerned her claim for alimony should be superior to them. But it is evident that Herbert J. Chittenden before his marriage to Mary S. Chittenden, for some reason, determined to incumber his property to the amount of three or four thousand dollars, and he did so. The evidence does not show that his father at that time was asking him for any security. He said in his statement to his father concerning the separation that he cared nothing for Mary when he married her, and simply married her as a matter of duty. Whether before his marriage he was looking forward to a time when he might be expected to respond in alimony and was *508 guarding against that by making these mortgages before he entered into the marriage relation, is not as clear, perhaps, as it might be; but in view of his conduct after their marriage, it would appear that he probably had that in view at that time.
There is another transaction which in our judgment throws-some light upon his conduct here and his purpose in this transaction. Shortly after their marriage, August 5, 1896, (they were married July 30th), he made her a deed of the home in. which they lived, it being a desire on her part — he calls it a , whim — that the home might be in her name. This is a portion, of the same property covered by the $6,500 mortgage. That deed was put on record very soon thereafter — received for record October 8, '1896. Until after the separation Mrs. Chittenden supposed that she was the owner of this home. It was always spoken of as her home. When the city was about to-assess the property, it was informed that it belonged to her. He often told persons that the property stood in her-name. She-spoke of it as her property. He told her .parents that he had' .given this home to her, and provided for her in that way; but on the 1st day of May, about a week after the separation, a ' quit-claim deed was put on record of this homestead from Mary S.. Chittenden, back to her husband. He testifies that the quitclaim deed was made and executed at the same timé the.deed was made from him to her, but they bear different dates. The deed from her to him is dated October 6, 1896, while the deed' from him to her is dated August 5, 1896. Mrs. Chittenden testifies that to her knowledge she never’ signed the quit-dr"m deed of this property back to her husband, and that she Had no-knowledge that such a deed was in existence, until her attention was. called to its bemg placed upon record, or the transfer being made, in May, 1900 — -four years, nearly, after the date of - its execution. We find from the evidence as a matter of fact that she never did knowingly sign and execute that quitclaim deed. The signature attached to it is probably genuine, but we find that she signed and executed this paper without any knowledge that she was signing a deed of this homestead property back to her husband. . It. seems to us that the-transaction would have been a futile one, and it is unreasonable-to suppose that she asked him that the homestead property might be in her name, that she might be the owner,of it, and he- *509 making this deed to her soon after their marriage, that as a part of the transaction she would be willing to immediately convey it-back to him. The quit-claim deed from her to him is kept off the record for nearly four years. Then this separation occurs after the wffe has signed this mortgage for $6,500, binding all the property that they have to the father. Until then this deed from her claim does not come to light; but after the separation, after this mortgage is made, it is then placed on record. We find that the $6,500 mortgage was duly acknowledged and witnessed, but find from these facts, from this evidence, that he procured her to sign this mortgage with the purpose of defrauding her of the claim which she was about to have for alimony. We find that she is now entitled to a judgment for alimony in some amount; that this mortgage, so far as her rights are concerned, is fraudulent and void, and should be inferior to any judgment for alimony that may hereafter be awarded her.
There is no prayer in her answer and cross-petition to have the quit-claim deed, as it is called, from Mary S. Chittenden to her husband cancelled and set aside. If there were such a prayer in the petition, we would have no hesitancy, in carielling it and setting it aside; but we hold that in equity she is the owner of homestead property; that it was conveyed to her by her husband, and that she never knowingly parted with the title thereto ; and we hold that so far as the homestead property is concerned, and so far as all property is concerned, that the $6,500 mortgage shall be inferior to any judgment that she may procure for alimony hereafter. As to the mortgages that were made before their marriage, we find that they should be satisfied, if possible, out of the real estate other than the homestead, she. in equity being the owner of the homestead, and it should be subjected last to the payment of the mortgages made before marriage; and if there is sufficient of the other property to satisfy those mortgages, the homestead property should not be taken for that purpose.
As to.the validity of the claim .between Edwin S. Chittenden and Herbert J. Chittenden, the majority of the court are unable to tell from this evidence and the consideration we have given it, how much Herbert J. Chittenden owes his .father, if anything — whether the moneys that Edwin S. Chittenden gave *510 to Herbert J. Chittenden from time to time were intended as loans or advancements, and therefore not to be returned. No note was ever given by Herbert J. to his father as this money was advanced; no security taken; no written contract ever existed between them. The father is wholly unable to tell us how much he advanced to his son, when he advanced it, or in what amounts, except as he learns it from the books, which were kept by the son. But as between Herbert and his father, Herbert J. admitting those claims, they are not to be disturbed. They are the only persons interested in them. But so far as Mrs. .Chittenden is concerned, we do not find, and we think it is unnecessary for us to find, whether in fact those claims are valid claims or not. We do not find here, so far as he is concerned, as affecting any claim that she may have against her husband for support and alimony and its amount, whether these are just and valid claims, that should be taken into consideration in determining the amount of the alimony or not. We will leave that to be determined by the court in which the alimony suit is pending. It is sufficient for this case to say, that so far as these mortgages are concerned, we find as already stated.
Our decision in this case is not to prejudice the rights of either Herbert J. Chittenden or his wife in the alimony suit as to the amount to be allowed, so far as his alleged indebtedness to his father is concerned, we simply do not find it necessary to pass upon that in this case, and we leave that without prejudice, to be considered by the court in which the alimony suit is tried in determining the amount of alimony.
A decree may be drawn in accordance with this opinion.